J-S93019-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TIMOTHY I. HIGHSMITH | |
| Appellant | No. 309 EDA 2015 |

Appeal from the Judgment of Sentence dated August 15, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000376-2013

BEFORE:  DUBOW, J., SOLANO, J., and PLATT, J.[*]

MEMORANDUM BY SOLANO, J.:                    **FILED MAY 26, 2017**

Appellant, Timothy I. Highsmith, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas following his conviction for third degree murder and possession of an instrument of crime.[1] Among other things, Appellant challenges the sufficiency of the evidence to support his conviction. We vacate, and remand for resentencing.

In the early morning hours of October 20, 2012, on a sidewalk in South Philadelphia, Appellant shot Wille Scott two or three times with a

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(c), 907(a).

licensed firearm.[2] The shots were fired following an argument that had begun at a bar earlier that morning,[3] when Appellant intervened in a physical altercation between Mr. Scott and Mr. Scott's girlfriend, Diana Williams. Appellant had drawn his gun on Mr. Scott, causing Mr. Scott's anger to turn toward Appellant. After leaving the bar and then returning, Mr. Scott followed Appellant for several blocks, verbally threatening him. After Mr. Scott caught up with and allegedly grabbed Appellant, Appellant fired his gun; one of the shots pierced Mr. Scott's heart and lungs, killing him. Appellant called 911 to report the shooting, fled the scene, and then turned himself in to police custody.

Appellant was convicted at a bench trial held in 2014. Because the issues in this case turn on a close analysis of the facts presented at that trial, we review the trial evidence in detail.

The Commonwealth presented Diana Williams, who testified that on the morning in question, she was at the bar with Mr. Scott (her boyfriend), Zahira Ali (her niece), and Appellant. *Id.* at 58, 66, 79, 81. The bar was located on the 1900 block of Hoffman Street. *Id.* at 62. Both Ms. Williams

_____

[2] Appellant testified that he shot Mr. Scott three times, although some witnesses only heard two gunshots. The gunshot wounds to Mr. Scott and bullets found at the scene were inconclusive regarding whether two or three shots were fired.

[3] The bar was an after-hours speakeasy, located in the basement of a private home. N.T., 6/9/17, at 63-64.

and Mr. Scott were intoxicated. *Id.* at 86-87. Ms. Williams and Mr. Scott began to argue, and Mr. Scott became violent. *Id.* at 67.[4] Appellant inserted himself between the pair, in an attempt to restrain Mr. Scott. When Mr. Scott continued his abuse of Ms. Williams, Appellant drew his gun and pointed it at Mr. Scott to force him to stop. *Id.* at 69-70. This enraged Mr. Scott further, and others at the bar had to restrain Mr. Scott to prevent him from attacking Appellant. *Id.* at 70-71, 93-94.

Ms. Williams exited, leaving Appellant and Mr. Scott still arguing downstairs. N.T., 6/9/14, at 72. When Mr. Scott joined her outside moments later, he blamed her for starting "all of this," and struck her. *Id.* at 73, 95. Ms. Williams walked to her home on the 1800 block of Hoffman Street. *Id.* at 62. Mr. Scott followed her, and was allowed entry to her home by Ms. William's nephew. *Id.* at 73-74. Mr. Scott was "ranting and raving" out of anger towards Appellant for having drawn his handgun. *Id.* at 100. Mr. Scott eventually left Ms. William's home, after she repeatedly asked him to leave. *Id.* at 74, 99.[5]

Five or ten minutes later, Ms. Williams departed her home and returned to the bar, out of concern for having left her niece there – but no

---

[4] Among other things, Mr. Scott pushed Ms. Williams in the face, causing her to fall into a chair. N.T., 6/9/14, at 67.

[5] Ms. Williams stated that by the time he left, Mr. Scott was "not as mad as he was prior," N.T., 6/9/14, at 75, but also that before he left, he "snatched" her phone from her, told her she "ain't calling nobody," and left her phone on a downstairs table on his way out the door. *Id.* at 99.

one was there when she arrived. N.T., 6/9/14, at 76, 79. Ms. Williams passed the bar, turned right down 20th Street, and was taking another right onto Mifflin Street when she heard two gunshots. *Id.* at 77, 79-80. She found Mr. Scott lying dead between two cars on the 1900 hundred block of Mifflin Street. *Id.* at 80.[6] Ms. Ali was on the other side of the street. *Id.* Ms. Williams did not see Appellant at the scene. *Id.*

Zahira Ali also testified for the Commonwealth. She stated that when Mr. Scott had assaulted Ms. Williams in the bar, she was afraid for her aunt's safety. N.T., 6/9/14, at 117. When Appellant pulled out his gun in her aunt's defense, he had aimed it at Mr. Scott's head and chest area. *Id.* at 114. Mr. Scott became angry and argued with Appellant, until Mr. Scott left. *Id.* at 118.

After Mr. Scott left the bar, Ms. Ali and Appellant waited for about fifteen minutes "so [Appellant and Mr. Scott] wouldn't get into it again outside." N.T., 6/9/14, at 120. But when Ms. Ali and Appellant went to leave, they saw that Mr. Scott was returning down Hoffman Street, heading in their direction, and was about three houses away. *Id.* at 122, 124. Ms. Ali and Appellant began walking away from Mr. Scott on Hoffman Street, then

---

[6] Photographs of the scene introduced by the Commonwealth show that the sidewalk is approximately one car-width wide. It is lined on one side with parked cars and on the other side with brick rowhomes, some with small porches and stairs.

- 4 -

turned right down 20th Street, took another right upon reaching Mifflin Street, and went onto the 1900 block. *Id.* at 121, 145-47.

Mr. Scott followed them from approximately a car-length away, and yelled at Appellant as he did so. N.T., 6/9/14, at 123, 127, 146. Ms. Ali testified that they never stopped walking and that Appellant tried to keep his distance "so that it wouldn't be an altercation," but that Mr. Scott kept pursuing them. *Id.* at 129, 150. Ms. Ali stated, "I don't know if [Mr. Scott] threatened to kill [Appellant], but he threatened to beat [Appellant] up." *Id.* at 129; *see also id.* at 125, 128. On cross-examination, Ms. Ali was confronted with the statement she gave to the police, in which she stated that Mr. Scott "said to [Appellant that] he had been shot before and a gun does not scare him. . . . He told [Appellant] that now that he had pulled the gun on him, that he better watch his back." *Id.* at 134, 149.[7]

Ms. Ali testified that at the exact moment the shots were fired, she was facing away from Appellant and Mr. Scott because she was crossing the street. N.T., 6/9/14, at 130. She stated that she never saw the two men physically engage. *Id.* at 133. When Ms. Ali turned back around after

---

[7] Ms. Ali remembered giving the statement, but when asked if she remembered Mr. Scott speaking the words that she had reported to the police, responded: "I mean, not exactly. I mean, I really try not to remember this, like, this whole incident." N.T., 6/9/14, at 149-50.

hearing the shots, she saw Mr. Scott lying in the street, but did not see Appellant. *Id.*[8]

Susan Fournier, who resides on the 1900 block of Mifflin Street, testified that she was awakened that morning by the argument outside of her window. N.T., 6/9/14, at 164-65. According to Ms. Fournier, Mr. Scott, who was larger than Appellant, stood in the street, and Appellant was standing in between two cars. *Id.* at 166-67. Ms. Fournier's testimony was that the two men were six or seven feet apart from each other when they were arguing outside of her window. *Id.* at 176. Ms. Fournier stated that she could not make out what Appellant was saying, because —

> The bigger guy [(Mr. Scott)], was overpowering [Appellant] by his voice, and he just kept on saying, you better do your schooling on me[,] the "N" word[,] and repeating that, and towards the end of the fight, I told you you'd better do your schooling on me or you're going to wind up getting popped.

*Id.* at 168-69. Mr. Scott then made a gun gesture with his hand. *Id.* at 169. After about five minutes, the pair parted by going separate ways, with Mr. Scott turning back towards 20th Street,[9] and Appellant continuing towards 19th Street. *Id.* at 169, 172-75, 177.

---

[8] Ms. Ali gave a statement to the police later that morning. She recounted the events as follows: "[Appellant] tried to keep his distance but [Mr. Scott] kept being on him. Then [Appellant] pulled his gun out and shot [Mr. Scott] a couple of times." N.T., 6/9/14, at 136.

[9] Ms. Fournier testified that she watched Mr. Scott walk one and a half car-lengths back towards 20th Street. N.T, 6/9/14, at 178-79.

Thinking that the confrontation was over, Ms. Fournier left the window; when she heard gunshots seven or eight seconds later, and a woman screaming, she called the police. N.T., 6/9/14, at 170, 172, 178, 181. Once the police arrived and she went outside, she was surprised to see that Mr. Scott was lying dead at the end of the block near 19th Street, where Appellant had been headed. Ms. Fournier had last seen Mr. Scott going in the other direction (towards 20th Street), and had not heard them speaking after that. *Id.* at 171, 174, 180.

The Commonwealth presented Detective Ryan Peters, who had taken a statement from Appellant five days after the shooting. N.T., 6/9/14, at 189. In the statement, Appellant explained that when he arrived at the bar that night, Mr. Scott and Ms. Williams were fighting. *Id.* at 193. A few people tried to intervene, including Appellant, until Ms. Williams left. *Id.* In the statement, Appellant related to the police:

> When she left me and Will [Mr. Scott] were having words in the basement. [Mr. Scott] pushed me and I had to adjust myself. (Motions to his right waistband.) I let it be known that I was armed and licensed to carry. I told him that I didn't have a problem with him but that he can't be hitting on a female. I asked him to calm down. Then [Mr. Scott] left after that.

*Id.* at 193-94 (quotation marks omitted).

According to Appellant's statement, Appellant and Ms. Ali then went outside to leave, and saw Mr. Scott returning. N.T, 6/9/14, at 194.[10] Appellant walked down 20th Street, and turned right on Mifflin Street, with Mr. Scott following. *Id.* Appellant told Detective Peters:

It was in the middle of the block that it started up again. [Mr. Scott] was saying stuff to me. He said that he had been shot before, and he was saying that I am not about that life. I tried to blow it off. I was still walking toward 19th when he grabbed m[e] like this. (And [Appellant] motioned to grabbing [Detective Peters'] left arm.) And I had the gun right here. (Indicating [Appellant's] right side.) I didn't have a holster and I grabbed the gun. That's when I shot him as I turned around. I wasn't sure what [Mr. Scott] was going to do right then.

*Id.* at 194-95. The statement continued:

Question: How many times did you shoot [Mr. Scott]?

Answer: I fired the gun three times.

Question: Do you know where on [Mr. Scott's] body that you shot him?

Answer: No. The first time he backed up, he got off me and his grip came off. Then it was like that (and he snapped his fingers), the other two shots. At that time all I could see was his hand, he was bigger than me. I could just see his hand.

_____

[10] According to the statement, Ms. Williams was still present, and at this point Mr. Scott struck her again. N.T, 6/9/14, at 194. When asked during trial about this portion of the confrontation, Appellant testified that he didn't remember exactly when Ms. Williams was struck. N.T., 6/10/14, at 113-15.

*Id.* at 197-98 (quotation marks omitted). The statement then turned to Appellant's actions after the shooting. *Id.* at 198-99.[11] When asked "Is there anything else that you would like to add at this time?," Appellant responded, "I was fearful for my life. I am sorry that this happened, I am not a killer. I don't want to kill nobody." *Id.* at 200.

The Commonwealth presented Dr. Samuel Gulino, a forensics pathology expert. N.T., 6/9/14, at 38. A different medical examiner had prepared the original autopsy report under the supervision of Dr. Gulino, but he was on leave from the Philadelphia Medical Examiner's office at the time of Appellant's trial. *Id.* at 39. Dr. Gulino reviewed the original report and autopsy photographs prior to testifying. *Id.* at 40. Dr. Gulino testified that Mr. Scott received three gunshot wounds: one penetrating wound to his mid-left chest, one perforating wound to his mid-abdomen, and one graze wound to his upper-right thigh. *Id.* at 34, 42-49.[12] Dr. Gulino also testified that Mr. Scott was intoxicated at the time of his death,[13] and weighed 281 pounds. *Id.* at 40.

_____

[11] According to Appellant's statement to Detective Peters, after the shooting Appellant called 911, ran into a friend of his, gave his firearm to his aunt, and turned himself in to the police. N.T, 6/9/14, at 198-99.

[12] Dr. Gulino posited that the graze wound on Mr. Scott's thigh may have been caused by the same bullet that entered and exited his abdomen. N.T., 6/19/14, at 42.

[13] Mr. Scott had a blood alcohol content of .117%, approximately one and a half times the legal limit for driving, and his blood contained alprazolam

*(Footnote Continued Next Page)*

Dr. Gulino stated that no gunfire residue was found on the body or clothing of Mr. Scott. N.T., 6/9/14, at 56. The original examiner's report had stated, regarding the shot to Mr. Scott's chest: "There is an approximately 1/16" darkened area at the edge of the 3:00 to 9:00 aspect of the wound." **See** Commonwealth's Exhibit 16, at 7 (unpaginated document). Regarding both the chest wound and the abdomen wound, the report stated that, "There is no fouling or stippling of the adjacent skin." **Id.**[14] The report did not mention any darkening or soot in relation to the graze wound to Mr. Scott's thigh. **Id.** Regarding his clothing, the report stated that there was no soot around the fabric of the perforations. **Id.** at 8.

The Commonwealth presented Officer Kelly Walker, an expert in firearms identification comparison and ballistics evidence. N.T., 6/9/14, at 204-05. Using Appellant's firearm, Officer Walker performed a "distance determination test," which established that gunshot residue would appear on a target[15] when it was shot in a closed environment from less than 36 inches

_(Footnote Continued)_ ———————————

(Xanax) at a level equal to a normal dose of that drug. N.T., 6/19/14, at 49-50, 54.

[14] "Stippling" is a type of gunshot residue that is left on a victim's skin. N.T., 6/9/14, at 223.

[15] The test used a target made of material similar to a mixture of paper and cardboard. N.T., 6/9/14, at 216. Typically a distance determination test would be done with a comparison "question pattern" or "questioned item" (a t-shirt, for example) in an attempt to recreate a gun residue pattern that would determine the distance from which the gun was shot. **Id.** at 215, 221.

away from the muzzle of Appellant's firearm. *Id.* at 215-17.[16] The Commonwealth asked, "So if there are multiple gunshot wounds to an individual, entrance wounds and there were no visible soot or stippling on any of those injuries, would that be consistent with something having been fired more than 36 inches away from the body?" Officer Kelley responded "Yes." *Id.* at 228-29. Officer Kelley stated that there was also "bullet wipe" left in the bullet hole itself when she shot the paper target from 36 inches away (and at all closer distances). *Id.* at 222, 228.[17]

On cross-examination, Officer Walker stated that the residue could be brushed off of a target, or a body; but she was unable to state from what distances this was likely to happen, what rough percentage of residue could easily be brushed off after a shot from various distances, or the likelihood that this would happen naturally. N.T., 6/9/14, at 222-27. She stated, "[I]f [the residue] is in close contact with your skin, it may burn into your skin. So some of them will burn into the paper [target] or it could be brushed off. Some of it could very well be brushed off." *Id.* at 223. Defense counsel asked, "[I]n this case someone was shot . . . and they were wearing clothing

---

[16] Residue appeared on the target when it was shot from 18, 24, and 30 inches away. N.T. 6/9/14, at 217.

[17] Officer Kelley explained that "bullet wipe" is soot that is wiped from the bullet as it travels through a bullet hole. Officer Kelley did not explain whether bullet wipe would typically be left inside of a wound and visibly evident during a medical examination.

when they were shot. So if they're shot, is it possible that the residue could have brushed off?" *Id.* at 225. Officer Kelley responded:

> On a person that is possible. I mean, you figure a person, you know, they're moving. So maybe their arms are brushing. You don't know what's going on at the time that would cause that. That's why I was explaining this is actually done in a controlled environment where we don't have any of that. We don't have weather conditions or people or movement. Everything is steady. Other factors will take place with something like this. So even at 30 inches, it could very well be 30 inches, but may not be visible because maybe something did brush against it. There is no way to know without the item.

*Id.* at 225-26. When asked about the effect of weather, Officer Kelley stated "Oh, well, wind. I mean, wind blows. Remember gunshot residue is almost – it's fine. It's almost like a powder or like a mixture of a powder and an ash, so to speak. So you have wind, you have rain, those type of weather conditions." *Id.* at 226-27.

Defense counsel asked Officer Kelley whether the residue could have been brushed off of an item that had been shot from 18 inches away, and Officer Kelley responded "I don't know about all, but like I said, I would really have to have seen . . . the actual garment, the actual item. Some could have been brushed off, but I don't know." N.T., 6/9/14, at 226. She agreed when defense counsel's asked whether it was "a fair statement to say that in this case if there is no residue found on the clothing of the person

who was shot, that it could have been shot anywhere from let's say maybe 24 to 36 inches and still have [no visible residue]." *Id.* at 227.[18]

After the Commonwealth rested, defense counsel introduced stipulations that Appellant had a license to carry the firearm that was used in this case and that Mr. Scott had two prior convictions for simple assault. N.T., 6/10/14, at 36-38. Defense counsel then presented two character witnesses, who testified that Appellant had a reputation as a peaceful person and law-abiding citizen. *Id.* at 42, 48.

Finally, Appellant testified in his own defense. Appellant, who weighed around 180 pounds at the time of the shooting, had finished working a nightshift around 1:30 a.m. that morning. N.T., 6/10/14, at 51-52, 89. He joined the others at the bar between 3:30 and 4:00 a.m., after receiving a text message from Ms. Ali. *Id.* at 54-56. Appellant said that after staying at the bar for about 45 minutes, he exited upstairs and was about to leave when he heard a commotion in the basement. *Id.* at 56-57, 94. Appellant

---

[18] The Commonwealth also presented testimony from the responding officer to the scene, N.T., 6/9/14, at 232-42, the detectives who recovered the firearm and ammunition evidence from Appellant's home, *id.* at 243-51; N.T., 6/10/14, at 21-35, an officer who collected evidence and took photographs at the scene, *id.* at 7-20, and Bryan O'Neil. Mr. O'Neil testified that he saw Appellant earlier that morning; he had heard the gunshots as he was walking up 20th Street later that morning; and as he turned the corner onto Mifflin Street, he saw Mr. Scott lying dead on the ground and called the police. N.T., 6/9/14, at 155-57. The testimony of these witnesses appears to be inconsequential to the issues before us.

returned downstairs and saw Mr. Scott and Ms. Williams fighting. *Id.* at 57.[19]

Appellant said he intervened by grabbing Mr. Scott's arm, and Mr. Scott pushed him against the wall. N.T., 6/10/14, at 58. Mr. Scott again attacked Ms. Williams, and Appellant stepped in front of her and pushed her out of the way. *Id.* Appellant testified:

> I tell her get back, and now [Mr. Scott] is still coming at me. So I pull my gun, and I put my hand out like this, and I tell him to stop, like, stand, you know, get back.
>
> So at that time [Ms. Williams], she makes her way around me, goes up the steps. . . .

*Id.* Appellant testified that after he drew his gun and told Mr. Scott to stop, he had his gun facing down, at his side. *Id.* at 62-63. According to Appellant, even after he drew his gun, Mr. Scott was still trying to attack him, but others were holding him back. *Id.* at 63-64.[20] Mr. Scott said, "[A]ll right, okay, I got ya. I see you got your little thing on you or whatever. So I got something for you," and went up the stairs and out the door. *Id.* at 65.

Appellant testified that he and Ms. Ali decided to wait for fifteen minutes before leaving the bar. N.T., 6/10/14, at 68. As they were leaving, they saw Mr. Scott coming down Hoffman Street. As soon as Mr. Scott

---

[19] Appellant testified that Mr. Scott caused Ms. Williams to stumble into a chair, pushed her face, and was charging at her again with balled fists at the time he intervened. N.T., 6/10/14, at 59-60.

[20] Appellant testified that the bar-owner also arrived with a shotgun during the fight between Mr. Scott and Ms. Williams. N.T., 6/10/14, at 107.

approached them, he began yelling and screaming obscenities. ***Id.*** at 69. Appellant stated, "I started to go towards 19th Street, but then when I seen him, I turned the other way to walk towards 20th." ***Id.*** at 68. Appellant and Ms. Ali took a right on 20th Street, and another right when they reached Mifflin Street. ***Id.*** at 69-72. Appellant followed them, from about one and a half car-lengths away. ***Id.*** at 70.

Appellant testified that while Mr. Scott was following Appellant and Ms. Ali, Mr. Scott said the following:

> You don't know who you pulled a gun out on. Blasting people who punk fake. They not here no more . . . the last two people who punked fake like that with [me] . . . They're not here anymore.

N.T., 6/10/14, at 69-70. Appellant stated:

> I remember him saying that this isn't going to blow over and I better watch my back. . . . [H]e actually said to me that I better do my homework on him, and I better – he said it again. I better watch my back or I'm going to get got.

***Id.*** at 71.

When Appellant and Ms. Ali turned onto Mifflin Street from 20th Street, Mr. Scott was then following them from about a car-length away. N.T., 6/10/14, at 72-73. Appellant stated that he tried to turn and talk to Mr. Scott:

> I try to – I turned to him and I tried to tell him I don't want no problems, like. I just tried to talk to him calmly, try to calm him down. Just trying to explain to him, like, you were wrong for what you were doing and everything like that, and like it's over. I don't want no problems.

*Id.* at 72. At that point the two men were four or five feet apart. *Id.* at 73.

Afterwards, Appellant kept walking towards 19th Street, and Mr. Scott kept

repeating his threats. *Id.* at 73-74. In the middle of the block, Appellant,

who was on the sidewalk, again engaged Mr. Scott, saying

> I don't want any – I don't want no problems. I really don't want
> no trouble. I don't want no problems. Could you please go ahead
> and go about your business.

*Id.* at 74-76. After a two minute conversation, again with Mr. Scott four or

five feet away, Appellant turned to walk away. *Id.* at 74-75.

Appellant testified that as he turned to walk away, Mr. Scott grabbed

him on his left arm. N.T., 6/10/14, at 75-76. Appellant was shocked. *Id.* at

76. According to Appellant:

> He grabs my arm, I am trying to get him off of me. So I step
> forward this way. After he grabbed my arm, he was forcing me
> to spin towards him, towards his direction, but I'm still trying to
> go this way, but his force was greater than mine at the time. So
> he grabbed me. I drew my gun. I shot down low in like his leg
> area. He stepped back. . . he just stepped back and then he
> charged at me again.

*Id.* at 77. When asked to elaborate on how Mr. Scott had grabbed him,

Appellant testified:

> He's – after he grabs me, he spins me around, and we're still – I
> mean, we're within – I don't know, I want to say three feet
> within each other, and he spins me around. He's trying to – he's
> coming in my direction trying to – First, I'm trying to get him off
> me. . . . I am trying to shake him, but that didn't work at the
> time. . . . That's when I drew my firearm and I shot in his leg
> area. . . . I was trying to leap forward, like maybe like my body
> wouldn't be able to – he would let loose. I could probably break
> loose that way . . . I am trying to shake him off me and move
> forward. . . I am trying to step forward. . . .

*Id.* at 78-79 (questions by defense counsel omitted).[21]

Appellant testified that after he fired the first shot at Mr. Scott's legs:

[Appellant]: He stops for not even a second, just stopped, and then he leaped forward.

[Defense counsel]: When you say he stopped, what did he stop doing? What do you mean he stopped?

[Appellant]: He stopped. He wasn't grabbing me no more at the time.

[Defense counsel]: Okay. And so explain that. He was grabbing your arm. You shot and now he's not grabbing your arm. So how did it come that he went from grabbing your arm to not grabbing your arm?

[Appellant]: He grabbed my arm trying to get away from him. I can't shake him. So I pull my firearm. I shoot. That's when he let's go and he stops for not even a second, and then he leaps forward.

[Defense counsel]: . . . So he stops and then what do you see him do?

_____

[21] On re-direct examination, Appellant similarly testified:

He grabs me, grabs the back of me. I am trying to move forward, get away from his grasp. I can't. So in that same – right directly all in the same – one right after another, turns. I mean, I spin. He turns me around. I turn. I shoot. . . .

N.T., 6/10/14, at 135-36. And again, this time acting it out for the court:

I am walking. He grabs me, I am trying to get him off me, and I am trying to go this way. He spins me. I turn around. Then I shoot. He's right here. He stops for not even a second. He just stops, and then I see his hands and he's lunging towards me.

*Id.* at 136.

[Appellant]: I see him – I see his hands in the air. I see one fist balled up, and he's reaching for me and he's leaping forward.

[Defense counsel]: And so when you see that, what is it that you do?

[Appellant]: I aim a little higher than the first shot and I fire again.

N.T., 6/10/14, at 79-80.

Appellant testified about the fear he faced when Mr. Scott grabbed

him:

[Appellant]: I was afraid. All I knew was that – I mean, this man had at least 100 pounds on me, and I was just trying to get away from him. . . .

[Defense counsel]: Okay. And so after that first shot and he stops and then starts coming at you again, what is going on in your mind at that point?

[Appellant]: I mean, I don't know what's more intense than being scared. I mean, I was – my fear factor was even worse at the time. I mean, it was to a maximum level at that point.

[Defense Counsel]: What is it that you were afraid of?

[Appellant]: I mean, this man – if this man get – if he grabs me again and gets the advantage over me, it's over. Like, I am not – I am not going to get out of this situation. I mean, I know his intentions. He stated his intentions, and now his actions are matching, and I am just trying to get away from this man.

[Defense counsel]: What did you think was going to happen?

[Appellant]: I thought if he – that he was going to grab my gun and take my gun from me and use it on me.

[Defense counsel]: And why would you think that?

[Appellant]: I mean actually – I mean, he stated it. Like, he said it earlier. Like, I mean, that's one of the things that I actually

- 18 -

forgot that he said, but that's what he said he was going to do, and but I didn't pay it no mind, but words are words.

N.T., 6/10/14, at 82-83.

On cross examination, Appellant was asked whether, after he fired the first shot, did he "pivot and turn and run?" Appellant testified:

[Appellant]: Like I said, when he stopped, I shot. He stopped not even for a second. He stopped and then he's still coming at me.

[Commonwealth]: And so at this point you said that he stops. Even if for a second, do you pivot and turn and run? You played basketball your whole life. Pivot and turn is the easiest thing, you know. It's instinct. At any point did you pivot and turn and run?

[Appellant]: I mean, playing basketball, I mean, for me being my height[22] playing basketball, I mean, you would think I would have good knees, but I don't really have the best knees. That's why I didn't play for high school. But I mean, he was too close and he was coming at me so fast. I didn't have – I didn't have any room or time to get away from him.

* * *

[Commonwealth]: . . . You don't think you had time to turn and run?

[Appellant]: Ma'am, I was there. I lived it. I did not have time to run. I didn't have time to – I had to react some kind of way. He was charging at me. It was happening fast.

N.T., 6/10/14, at 118-21.

On re-direct examination, defense counsel again asked Appellant why he didn't run away after he fired the first shot:

_____

[22] Both Appellant and Mr. Scott were approximately 6'2" tall.

- 19 -

[Defense counsel]: And so why is it that when you turned and shot the first time, that as he's coming towards you again, why did you feel that you need to – why did you feel you could not run, continue to run?

[Appellant]: Based on my positioning, I mean, directly behind me was a house and stairs right there. I mean, that was the only thing that was directly in my direction. Now, it wasn't no clear path to try to get away from him.

[Defense counsel]: Weren't you just on the sidewalk?

[Appellant]: Yes, we were on the sidewalk. Like I said, like I said, look at the positioning . . .

* * *

[Defense counsel]: We're asking – the question is, as you're turning and you shoot the first time and you're backing up, you're backing up and why do you feel that you're unable to run?

[Appellant]: Because he was still coming at me, and I knew where my positioning was on the sidewalk. I knew what was in back of me, and he was close. Like he was – it wasn't like he was far away from me. I mean, he wasn't slow.

[Defense counsel]: So if you were to turn and run, like what did you think was going to happen?

[Appellant]: I would have no chance. I would have been caught. He would have had me, like.

[Defense counsel]: And what do you mean by he would have had you? What do you think he would have done?

[Appellant]: He would have killed me.

N.T., 6/10/14, at 137-38.

After the second or third shot, Mr. Scott stumbled and fell on a car and into the street. N.T., 6/10/14, at 81. Appellant called 911, and gave his

- 20 -

name. ***Id.***[23] Appellant then walked to the intersection of Front Street and Oregon Street. ***Id.*** at 123. According to Appellant, "I just panicked, and I just shut down and I just – I just got out of there." ***Id.*** at 84; ***see also id.*** at 122-23.

Appellant was charged with murder in the first degree, murder in the third degree, and possession of an instrument of crime. N.T., 6/9/14, at 14. He waived his right to trial by a jury. His primary defense during the bench trial was self-defense, and he focused his closing argument on that defense. Although he did not emphasize "imperfect self-defense," ***see*** N.T., 6/10/14, at 150-75, he did ask the trial court to include voluntary manslaughter among the charges it should consider. ***Id.*** at 199.[24]

The trial court convicted Appellant of third-degree murder and possession of an instrument of crime, and it sentenced Appellant to seven and one-half to fifteen years of incarceration. Appellant filed a timely post-sentence motion and appeal. In a Rule 1925(b) statement, Appellant claimed that the evidence was insufficient to sustain a conviction of third-degree

---

[23] A recording of the 911 call was played at trial, but was not included in the certified record. ***See*** N.T., 6/10/14, at 82, 143-44.

[24] As discussed later in the text, a person acts in "imperfect" self-defense when he holds an actual, but unreasonable, belief that deadly force is necessary to prevent his own death or serious bodily injury. ***See Commonwealth v. Rivera***, 108 A.3d 779, 787 n.2 (Pa. 2014)). As opposed to perfect self-defense, which is a complete defense to murder and, if proven, would result in an acquittal, proof of imperfect self-defense results in a conviction of voluntary manslaughter. ***Id.*** (citing 18 Pa.C.S. § 2503(b)).

murder because, among other reasons, the Commonwealth failed to disprove self-defense beyond a reasonable doubt, or, "[a]t most the killing was a case of mistaken belief and rose no higher than voluntary manslaughter." Tr. Ct. Op. at 8. Appellant also contended that the verdict was against the weight of the evidence and that the sentence was invalid. *Id.* at 8-9.

In a Rule 1925(a) opinion, the trial court rejected each of Appellant's arguments. With respect to sufficiency of the evidence, the court held that "there was overwhelming evidence from which a reasonable fact finder could conclude that defendant killed Mr. Scott with malice aforethought." Tr. Ct. Op. at 11. The court explained:

> Susan Fournier, a disinterested witness to the killing, testified that she heard much of the confrontation from her apartment. She stated that after having her attention drawn to the incident by the men's loud argument she observed that they were six to seven feet apart just seconds before gunshots rang out. Immediately thereafter, she went outside and observed decedent lying on the street covered in blood. Further, defendant admitted to killing Mr. Scott in his statement to Detective Ryan Peters. N.T. 6/09/2014 at 191. In his statement, defendant said he shot Mr. Scott after he grabbed defendant's left arm from behind. He fired his gun three times at Mr. Scott. After the first gunshot, Mr. Scott backed away from him. Defendant then fired two gunshots at Mr. Scott's chest. A fact-finder may infer malice where a defendant intentionally used a deadly weapon on a vital part of the victim's body.

*Id.* (citation omitted).

The trial court then held that the Commonwealth had disproved Appellant's self-defense claim. The court stated:

- 22 -

First, the evidence shows that [Appellant] provoked the initial confrontation with Mr. Scott by brandishing his gun when it was unnecessary to do so. Thereafter, [Appellant] continued the use of deadly force when he again encountered Mr. Scott on the street. [Appellant] testified that after the first shot, Mr. Scott loosened his grip and backed away from him. However, [Appellant] fired two gunshots into the victim's chest. Indeed, Ms. Fournier testified that the two men were some six to seven feet apart immediately before the shots were fired. These facts show that [Appellant] continued to use deadly force when it was not warranted.

The record reveals that [Appellant] was not operating under a reasonable belief that he was in imminent danger of death or great bodily harm. . . [Appellant] was not operating out of an honest bona fide belief that was reasonable in light of the facts. Although [Appellant] testified that he killed Mr. Scott because he feared for his life, the facts show that this was not a credible claim. . . . Mr. Scott's alleged act of grabbing [Appellant]'s arm did not constitute an imminent threat of serious bodily harm. In addition, there was no evidence that Mr. Scott displayed or used a gun or any other weapon during this encounter. Thus, it was not immediately necessary for [Appellant] to shoot decedent two times. Therefore, [Appellant] could not have reasonably believed that there was an imminent threat of death or serious bodily injury. In light of the above, the Commonwealth sufficiently disproved defendant's self-defense claim.

Trial Ct. Op. at 12-14 (quotation marks, brackets, and citations omitted).

Later, in rejecting Appellant's argument that the verdict was against the weight of the evidence, the trial court added:

Although [Appellant] testified that he shot Mr. Scott in self defense because he feared for his life, the fact-finder was entitled to find this testimony incredible and to credit the compelling evidence presented by the Commonwealth. As previously discussed, the Commonwealth disproved defendant's self-defense claim. The evidence shows that defendant was not operating under a reasonable belief that he was in imminent danger of death or great bodily harm.

- 23 -

*Id.* at 15.

Appellant raises three issues on direct review:

[1.] Whether the evidence was insufficient as a matter of law to sustain Appellant's conviction for murder in the third degree[?]

[2.] Whether the verdict was against the weight of the evidence?

[3.] Whether the sentence was . . . manifestly excessive and imposed in violation of *Alleyne v. United States*[,] 133 S. Ct. 2151 (2013)[,] and *Commonwealth v. Hopkins*, 117 A.3d 247 (Pa. 2015[)]?

Appellant's Brief at 6.

"A challenge to the sufficiency of the evidence is a question of law subject to plenary review." *Commonwealth v. Snyder*, 870 A.2d 336, 346 (Pa. Super. 2005).

When reviewing a sufficiency of the evidence claim, this Court must review the evidence and all reasonable inferences in the light most favorable to the Commonwealth as the verdict winner, and we must determine if the evidence, thus viewed, is sufficient to enable the fact-finder to find every element of the offense beyond a reasonable doubt.

*Commonwealth v. Goins*, 867 A.2d 526, 527 (Pa. Super. 2004).

Appellant's brief is, to put it charitably, bare-bones. His insufficiency argument boils down to a single paragraph:

The question in this case is one of what evidence existed that Appellant possessed the hardness of heart or a mind heedless of social duty that give rise to an inference of malice. What the evidence did support was a finding of the imperfect defense of self-defense. The evidence was not sufficient as a matter of law to support a finding of third degree murder because the evidence did not prove beyond a reasonable doubt that Appellant possessed the requisite *mens rea* for third degree murder. Thus, the verdict should have been one of voluntary manslaughter and

not third degree murder. As stated above a successful claim of imperfect self-defense reduces murder to voluntary manslaughter, **Commonwealth v. Tilley**, 595 A. 2d 575 (Pa. 1991), **Commonwealth v., Truong**, 36 A. 3d 592 (Pa. Super. 2012) **Commonwealth v. Sheppard**, 648 A. 2d 584 (Pa. Super. 1994). In this case it is clear from the evidence that such a claim was made. The conviction for third degree murder therefore cannot stand. The case should be remanded for resentencing on voluntary manslaughter.

Appellant's Brief at 14. As this paragraph demonstrates, Appellant presents a single interrelated challenge to the sufficiency of the evidence establishing the malice needed for murder and the evidence disproving self-defense.

Before a defendant may be found guilty of third-degree murder, the Commonwealth must prove that he acted with malice. **Commonwealth v. Fisher**, 80 A.3d 1186, 1191 (Pa. 2013).

> Third-degree murder is a killing done with legal malice but without the specific intent to kill required in first-degree murder. Malice consists of a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty. Malice exists where the principal acts in gross deviation from the standard of reasonable care, failing to perceive that such actions might create a substantial and unjustifiable risk of death or serious bodily injury.

**Commonwealth v. Kendricks**, 30 A.3d 499, 509 (Pa. Super. 2011) (bracket and citation omitted), **appeal denied**, 46 A.3d 716 (Pa. 2012). As the trial court correctly noted, a finder of fact may infer malice based on a defendant's use of a deadly weapon on a vital part of a victim's body. Tr. Ct. Op. at 11; **see Commonwealth v. Thomas**, 54 A.3d 332, 335-36 (Pa. 2012), **cert. denied**, 134 S. Ct. 173 (2013); **see also Commonwealth v. O'Searo**, 352 A.2d 30, 37 (Pa. 1976) ("That this presumption is a

reasonable one founded on human experience is obvious[; o]ne does not normally use a deadly weapon on a vital part of another's body unless he intends to kill").

We agree with the trial court that, absent consideration of Appellant's claim of self-defense, there is sufficient evidence in the record to establish that Appellant acted with malice sufficient to support a conviction of third-degree murder. Appellant shot Mr. Scott two or three times with a gun at close range, killing him. That evidence was sufficient to prove actual malice. However, a finding that a defendant acted in self-defense, or "imperfect self-defense," negates the finding of malice necessary for a murder charge. *Commonwealth v. Hart*, 565 A.2d 1212, 1217 (Pa. Super. 1989), *appeal denied*, 581 A.2d 569 (Pa. 1990). Appellant claims he acted in self-defense in this case.

Under the Crimes Code, self-defense falls under the defense of justification, which is a complete defense to criminal liability. *See* 18 Pa. C.S. § 502. Section 505(a) of the Code provides:

> The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

*Id.* § 505(a). Here, Appellant used deadly force — the gun that killed Mr. Scott. Under Section 505 of the Crimes Code:

> The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect

himself against death [or] serious bodily injury . . .; nor is it justifiable if:

> (i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

> (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating . . . .

18 Pa.C.S. § 505(b)(2). The overriding question in this case is whether Appellant had a reasonable belief that the deadly force he used against Mr. Scott was "necessary to protect himself" under this section.

To be justified under the Code, an actor's belief that he needs to use deadly force must be reasonable. If the actor actually, but unreasonably, believes that deadly force is necessary to protect himself against death or serious bodily injury, he exercises what the cases call "imperfect self-defense." **See Tilley**, 595 A.2d at 582; **Truong**, 36 A.3d at 599. The Crimes Code provides that a defendant who kills under such an unreasonable belief is guilty of voluntary manslaughter, rather than murder:

> A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing . . . but his belief is unreasonable.

18 Pa.C.S. § 2503(b).

In determining whether a defendant held a reasonable or unreasonable belief regarding the necessity of using deadly force, a factfinder must consider the totality of the circumstances:

> A number of factors, including whether complainant was armed, any actual physical contact, size and strength disparities

- 27 -

between the parties, prior dealings between the parties, threatening or menacing actions on the part of complainant, and general circumstances surrounding the incident, are all relevant when determining the reasonableness of a defendant's belief that the use of deadly force was necessary to protect against death or serious bodily injuries. No single factor is dispositive.

*Commonwealth v. Smith*, 97 A.3d 782, 788 (Pa. Super. 2014) (citations omitted). "[A] physically larger person who grabs a smaller person does not automatically invite the smaller person to use deadly force in response." *Id.*; *see, e.g.*, *Commonwealth v. Hill*, 629 A.2d 949, 951-52 (Pa. 1993) (where a 205-pound victim grabbed a 130-pound defendant by the collar after threatening to beat him up, use of deadly force still was not reasonable), *appeal denied*, 645 A.2d 1313 (Pa. 1994). *But see Commonwealth v. Eberle*, 379 A.2d 90, 94 (Pa. 1977) (defendant's belief that her use of deadly force was necessary was objectively reasonable when her aggressor was large, drunk, enraged, and had a history of violence). As our Supreme Court has expressed:

> [T]he critical question for the jury to decide is whether the facts as perceived by the accused in fact would have provided justification for the use of deadly force. To meet this requirement the mistaken belief must justify the conclusion that the actor is in imminent danger of death and that there is a necessity to use the deadly force in order to save himself.

*Commonwealth v. Cain*, 398 A.2d 1359, 1361–62 (Pa. 1979).

Critically, even if a defendant has an unreasonable belief in the need to use deadly force, he may not claim "imperfect self-defense" unless he meets all other requirements of a self-defense claim. As the Supreme Court

has stated, imperfect self-defense "is imperfect in only one respect — an unreasonable rather than a reasonable belief that deadly force was required to save the actor's life"; all other principles of self-defense must be met. ***Commonwealth v. Sepulveda***, 55 A.3d 1108, 1124 (Pa. 2012). Thus, the other requirements for self-defense under Section 505(b)(2), including that the actor not have "provoked the use of force against himself in the same encounter" and not have refrained from retreating if an opportunity to do so was available, remain applicable.

It is the Commonwealth's burden to disprove any claim of self-defense or imperfect self-defense beyond a reasonable doubt. ***Smith***, 97 A.3d at 788. A fact-finder may believe all, part, or none of the testimony presented to it, ***Commonwealth v. Thompson***, 934 A.2d 1281, 1285 (Pa. Super. 2007), ***appeal denied***, 946 A.2d 687 (Pa. 2008), and is not obligated to believe a defendant's self-serving testimony establishing a self-defense claim. But the Commonwealth, in order to disprove a self-defense claim, must introduce some evidence contradicting the claim "and cannot simply rely on the jury's disbelief of the defendant's testimony." ***Smith***, 97 A.3d at 788. Whether the Commonwealth has met its burden is a fact-intensive inquiry. Ultimately, in deciding whether a defendant's use of deadly force was justified, the fact-finder must view not only the final moments of a confrontation, but the events leading up to it. As the Supreme Court stated in ***Commonwealth v. McComb***, 341 A.2d 496, 499 (Pa. 1975):

> To determine the reasonableness of the use of a deadly force, the opportunity to retreat, the role of the accused in provoking or escalating the difficulty, the trier of fact is required, not only to evaluate the conduct of the appellant during the final confrontation but also to view it in light of those circumstances that preceded and precipitated that final confrontation.

*See Brown*, 421 A.2d at 663–64 (quoting *McComb*); *see also Commonwealth v. Mouzon*, 53 A.3d 738, 751 (Pa. 2012) (final altercation between defendant and victim should be viewed as the culmination of an ongoing confrontation).

Here, the trial court found that the Commonwealth disproved Appellant's self-defense claim on two bases. First, it said that Appellant "provoked the initial confrontation with Mr. Scott by brandishing his gun when it was unnecessary to do so." Tr. Ct. Op. at 12. Our review of the record compels us to find, however, that, as a matter of law, the evidence is insufficient to support this first basis.

> The Supreme Court has explained:

> In making the objective determination as to what constitutes sufficient provocation reliance may be placed upon the cumulative impact of a series of related events. The ultimate test for adequate provocation remains whether a reasonable man, confronted with this series of events, became impassioned to the extent that his mind was "incapable of cool reflection."

*Commonwealth v. McCusker*, 292 A.2d 286, 290 (Pa. 1972) (footnotes omitted). Therefore, while a defendant's introduction of a deadly weapon into a conflict may escalate the conflict and make a claim of self-defense unavailable, *see Commonwealth v. Johnson*, 331 A.2d 473, 476 (Pa.

- 30 -

1975), where a weapon has been both introduced and then removed from a confrontation by the defendant, and the victim delays before attacking in retaliation, the defendant is no longer acting as the aggressor in the conflict. *See, e.g.*, *Commonwealth v. Samuel*, 590 A.2d 1245, 1249 (Pa. 1991) ("Even if the initial display of the appellant's gun could be seen as provocative, the balance between the parties shifted when [the victim] left the room and appellant retreated to the dining area, setting down his weapon. [The victim's] re-entry into the living room with a sawed-off shotgun placed him in the position of being the aggressor"). Moreover, an actor's return to the scene of an earlier confrontation, and an actor's verbal threats to kill, are indicative that the actor is the aggressor. *See Mouzon*, 53 A.3d at 751; *Commonwealth v. Maione*, 554 A.2d 939, 944 (Pa. Super. 1989).

The trial court is correct that Appellant initially brandished his gun at the bar that morning in an effort to stop Mr. Scott's abuse of Ms. Williams. But the record shows that this initial confrontation then concluded when Mr. Scott left the bar and Appellant and Ms. Ali waited behind for about 15 minutes to make sure Mr. Scott had left the area. They re-encountered Mr. Scott outside the bar when Mr. Scott then persistently followed Appellant and Ms. Ali as they kept walking away "so that it wouldn't be an altercation." N.T. 129, 150 (testimony of Ali). The shooting occurred only after Mr. Scott caught up with Appellant on Mifflin Street and, according to Ms. Fournier,

berated Appellant and threatened to "pop" him. N.T. at 168-69. By then, Mr. Scott was no longer in immediate fear for his life and no longer was facing a "kill-or-be-killed" scenario of Appellant's creation. Mr. Scott's actions place him squarely as the aggressor at the time of the shooting. We therefore conclude, as a matter of law, that there was insufficient evidence that Appellant provoked Mr. Scott at the time of the shooting. *See Mouzon*, 53 A.3d at 751; *Samuel*, 590 A.2d at 1249; *Maione*, 554 A.2d at 944.

Analysis of the trial court's second basis is more complex. The trial court stated:

> The record reveals that [Appellant] was not operating under a reasonable belief that he was in imminent danger of death or great bodily harm. . . [Appellant] was not operating out of an honest bona fide belief that was reasonable in light of the facts. Although [Appellant] testified that he killed Mr. Scott because he feared for his life, the facts show that this was not a credible claim. . . . Mr. Scott's alleged act of grabbing [Appellant]'s arm did not constitute an imminent threat of serious bodily harm. In addition, there was no evidence that Mr. Scott displayed or used a gun or any other weapon during this encounter. Thus, it was not immediately necessary for [Appellant] to shoot decedent two times. Therefore, [Appellant] could not have reasonably believed that there was an imminent threat of death or serious bodily injury. In light of the above, the Commonwealth sufficiently disproved defendant's self-defense claim.

Trial Ct. Op. at 12-14. The court also stated:

> [Appellant] continued the use of deadly force when he again encountered Mr. Scott on the street. [Appellant] testified that after the first shot, Mr. Scott loosened his grip and backed away from him. However, [Appellant] fired two gunshots into the victim's chest. Indeed, Ms. Fournier testified that the two men were some six to seven feet apart immediately before the shots

> were fired. These facts show that [Appellant] continued to use deadly force when it was not warranted.

*Id.* at 12. There are three possible interpretations of these passages in the trial court's opinion: (1) Appellant did not really harbor a subjective belief that he was in a situation of imminent danger that required his use of deadly force; (2) Appellant did harbor such a belief, but the belief was unreasonable; or (3) Appellant's belief was legally insufficient because he could have retreated and did not do so.

Appellant testified that he had a subjective belief that he was in imminent danger. *See* N.T., 6/10/14, at 82-83, 137-38. There was abundant independent evidence to support the possibility that Appellant had such a belief and feared for his safety. Appellant was of a slender build compared to Mr. Scott, and weighed about 100 pounds less than Mr. Scott; Mr. Scott was intoxicated; Appellant had watched Mr. Scott physically assault Diana Williams earlier that morning; Mr. Scott knew Appellant was carrying a firearm, and yet still attempted to attack Appellant earlier that morning at the bar; and Mr. Scott was aggressively pursuing Appellant, and verbally threatening Appellant's life. Ms. Ali testified that as Mr. Scott followed her and Appellant, Mr. Scott threatened to "beat up" Appellant and said "he better watch his back." Susan Fournier testified that the victim told Appellant he was going to "wind up getting popped," while making a gun gesture. Ms. Fournier's testimony suggests that in the seconds before the shooting, Mr.

Scott approached Appellant quickly from the opposite end of the street.[25]

According to Appellant, Mr. Scott unexpectedly grabbed his arm, and after

Appellant fired the first shot, Mr. Scott continued to charge at him and

Appellant feared Mr. Scott would grab his gun. Although the trial court was

free not to believe Appellant's testimony, the Commonwealth presented no

evidence that disproved that Appellant had a subjective fear of death or

serious bodily injury.[26] There thus is insufficient evidence in the record to

_____

[25] Ms. Fournier testified that the last time she saw Appellant and Mr. Scott before the shooting, they had finished an argument in the middle of Mifflin Street and were heading in opposite directions — Mr. Scott was proceeding toward 20th Street, while Appellant proceeded toward 19th Street. After the shooting, she was surprised to see that Mr. Scott was lying on the ground near 19th Street. This evidence suggests that Mr. Scott turned around and went back to confront Appellant.

[26] In the midst of its paragraph explaining why Appellant "was not operating under a reasonable belief that he was in imminent danger of death or great bodily harm," the trial court said, "Although [Appellant] testified that he killed Mr. Scott because he feared for his life, the facts show that this was not a credible claim." Tr. Ct. Op. at 12-13. We read this sentence in the context of the rest of the paragraph, which, as we discuss below, we understand to relate to the unreasonableness of Appellant's conduct. But to the extent the sentence expresses doubt about whether Appellant was in fear, we have looked for evidence negating Appellant's claim and have found none. The court cites the testimony of Ms. Fournier, who it calls "a disinterested witness to the killing," that the men were arguing six or seven feet apart seconds before the shooting, *id.* at 11; but Ms. Fournier also testified that Mr. Scott was shot at the opposite end of the block from where she placed him during that argument, evincing that he clearly moved closer to Appellant before he was shot. The ballistics evidence showed only that the gun could have been 36 inches — little more than an arm's length — from Mr. Scott when it was fired, which fails to negate a close confrontation. Without evidence rebutting Appellant's claim that he was in fear, the trial court was not permitted to rely solely on its disbelief of Appellant's testimony on that point. **Smith**, 97 A.3d at 788.

support the conclusion that Appellant did not believe he was in imminent danger.

There also is insufficient evidence in the record to support a finding that Appellant did not try to retreat when he could do so. A defendant is obligated to retreat rather than use deadly force only if he knows he can do so with complete safety. *See* 18 Pa.C.S. § 505(b)(2)(ii); ***Commonwealth v. Johnston***, 263 A.2d 376, 380 (Pa. 1970) ("Life is sacred and if it is merely a question of whether one man should flee or another should die, then certainly the taking of life should be avoided and the person under attack should flee").[27] This is a question to be resolved by the factfinder. ***See Commonwealth v. McClendon***, 874 A.2d 1223, 1230 (Pa. Super. 2005); ***see also Commonwealth v. Bayard***, 309 A.2d 579, 582 (Pa. 1973) ("The jury must determine whether the facts as reasonably known to the slayer at that time would have justified the conclusion that he could have

_____

[27] A defendant using deadly force need not retreat if attacked by someone displaying a firearm, ***see*** 18 Pa.C.S. § 505(b)(2.3)(iii), or when "a reasonably prudent person would conclude that such a decision would increase his or her exposure to the threatened harm," ***Commonwealth v. Ventura***, 975 A.2d 1128, 1143–44 (Pa. Super. 2009). It is only the use of **deadly** force by a defendant which entails a duty by that defendant to retreat. ***See Commonwealth v. Sanders***, 280 A.2d 598, 600, (Pa. Super.), ***aff'd***, 284 A.2d 503 (Pa. 1971) ("It is certainly true that every citizen may rightfully traverse the street, or may stand in all proper places, and need not flee from every one who chooses to assail him. Without this freedom our liberties would be worthless. But the law does not apply this right to homicide. Ordinary defence [*sic*] and the killing of another evidently stand upon a different footing" (quoting ***Commonwealth v. Drum***, 58 Pa. 9, 21-22 (1868))).

avoided the danger by a reasonably safe means. In such an event our law requires that he avail himself of that means of escape rather than using a deadly force to repel the attack"). The trial court never explicitly said it based its decision on a failure to retreat. Its opinion merely cited the retreat provisions of Section 505(b) in a footnote that followed a sentence about an issue other than retreat: "[Appellant] was not operating under a reasonable belief that he was in imminent danger of death or great bodily harm." Tr. Ct. Op. at 12-13 n.4.

The record shows that after the altercation in the bar, Appellant and Ms. Ali waited 15 minutes before exiting the bar in an effort to avoid Mr. Scott. Then, they tried further to avoid him by walking away from him on Hoffman Street, turning right on 20th Street, and turning right again on Mifflin Street. Ms. Ali testified that she and Appellant never stopped, but Mr. Scott kept coming and eventually caught up to them. According to Appellant, Mr. Scott then grabbed Appellant's arm. Clearly, up to this point Appellant tried to get away from Mr. Scott.

Appellant testified that after Mr. Scott caught up to him, there was no opportunity to retreat. The trial court pointed out that, according to Appellant's account, Mr. Scott "loosened his grip and backed away from" Appellant after Appellant fired the first shot, but that Appellant then shot again. Tr. Ct. Op. at 12. The court concluded from that fact that "[Appellant] continued to use deadly force when it was not warranted," but it did not say

that Appellant was able to retreat at that point. ***See id.*** By all accounts, the shots occurred in quick succession. Appellant claimed that the second shot was prompted by Mr. Scott's lunge at him after the first shot was fired, at a time when Appellant was backed up near one of the houses lining the sidewalk and had no viable route of escape. There was no evidence rebutting that claim. The two witnesses at the scene, Ms. Ali and Ms. Fournier, did not testify that there was any opportunity for Appellant to retreat after the first shot was fired, and Ms. Ali, who was just across the street, said that all the shots occurred so quickly that by the time she could turn her head to see what happened, Mr. Scott was already on the ground. N.T. at 133. On this record, we conclude that the Commonwealth failed to prove that Appellant had an opportunity to retreat that Appellant failed to exercise.

We are left, then, with the interpretation of the trial court's opinion that most closely conforms to what the trial court actually said: that any belief by Appellant that he had to use deadly force was unreasonable. Once again, this is what the trial court said it found:

> The record reveals that [Appellant] ***was not operating under a reasonable belief*** that he was in imminent danger of death or great bodily harm. . . [Appellant] ***was not operating out of an honest bona fide belief that was reasonable*** in light of the facts. Although [Appellant] testified that he killed Mr. Scott because he feared for his life, the facts show that this was not a credible claim. . . . Mr. Scott's alleged act of grabbing [Appellant]'s arm did not constitute an imminent threat of serious bodily harm. In addition, there was no evidence that Mr. Scott displayed or used a gun or any other weapon during this encounter. Thus, it was not immediately necessary for [Appellant] to shoot decedent two times. Therefore,

> **[Appellant] could not have reasonably believed that there
> was an imminent threat** of death or serious bodily injury. In
> light of the above, the Commonwealth sufficiently disproved
> defendant's self-defense claim.

Trial Ct. Op. at 12-14 (emphasis added). Whether Appellant's belief of imminent danger was reasonable is a question for the factfinder. **Cain**, 398 A.2d 1361–62. Our review of the record convinces us that, although there is evidence that would enable a factfinder to conclude that Appellant's belief was reasonable, the evidence does not compel that conclusion. As the trial court observed, Mr. Scott was unarmed. As the trial court further emphasized, even if Appellant believed he needed to shoot Mr. Scott the first time, a belief that he had to shoot Mr. Scott again after Mr. Scott was wounded is less defensible. Viewing the record as a whole in a light favorable to the Commonwealth, we conclude that there was sufficient evidence for the trial court to conclude that Appellant's fear of imminent danger was unreasonable, at least at the time he fired the second or third shot that killed Mr. Scott.

The problem with this result is that, under the Crimes Code, a finding that Appellant acted out of a belief of danger that was unreasonable must result in a conviction of voluntary manslaughter, not third-degree murder. 18 Pa.C.S. § 2503(b). At the conclusion of the trial, Appellant's counsel specifically asked the trial court to consider a finding of imperfect self-defense, which would result in a verdict of voluntary manslaughter. And in his Rule 1925(b) statement, Appellant again made an imperfect self-defense

argument. In response, the trial court then explained its decision in terms that precisely match a finding of imperfect self-defense. And yet, for reasons that are not explained, the trial court did not change its verdict to voluntary manslaughter and, indeed, never discussed that issue. Although the trial court said "the Commonwealth sufficiently disproved defendant's self-defense claim," Tr. Ct. Op. at 14, it never mentioned Appellant's imperfect self-defense claim.

We agree with the trial court that the Commonwealth "sufficiently disproved [Appellant's] self-defense claim," but we conclude that the trial court made an error of law in not convicting Appellant of voluntary manslaughter, rather than murder. The evidence of record, confirmed by the trial court's own explanation of its decision in its Rule 1925(a) opinion, supports a verdict of voluntary manslaughter, not third-degree murder. Accordingly, we vacate the judgment of sentence imposed by the trial court, and remand for the trial court to resentence Appellant in a manner consistent with this memorandum. *See Commonwealth v. Polimeni*, 378 A.2d 1189, 1193 (Pa. 1977) (holding that voluntary manslaughter is a lesser included offense of a homicide charge); *Commonwealth v. Kelly*, 102 A.3d 1025, 1033 (Pa. Super. 2014) (vacating judgment of sentence and

remanding for resentencing where there was sufficient evidence to convict on a lesser-included charge).[28]

Judgment of sentence vacated. Case remanded with for resentencing. Jurisdiction relinquished.

Judge Dubow joins the memorandum.

Judge Platt files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/26/2017

---

[28] Because of our disposition, we need not address Appellant's second issue, regarding the weight of the evidence, or Appellant's third issue, regarding the length and legality of Appellant's sentence.